UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TERRY ALLEN, et al.,

                        Plaintiffs,

      v.                                        3:05-cv-1559

CITY OF NEW YORK, et al.,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

**I.    INTRODUCTION**

Plaintiffs commenced the instant action against Defendants seeking to recover for damage to their property allegedly caused by flooding. Plaintiffs essentially contend that Defendants mismanaged the Pepacton Dam, thereby allowing the flooding that caused damage to their property. Presently before the Court are Defendants' motions to dismiss pursuant to Fed. R. Civ. P. 12.

**II.    BACKGROUND**

    **a.    Brief History of the Pepacton Dam and Water Litigation**

In the 1920s, the State of New York proposed to divert a large amount of water from various tributaries of the Delaware River. State of New Jersey v. State of New York, 51 S. Ct. 478, 479 (1931). The State of New Jersey filed suit against the State of New York seeking to enjoin New York from diverting the water. New Jersey asserted "that the

proposed diversion will transgress its rights in many respects." Id at 480. New Jersey complained that the proposed diversion:

> will interfere with the navigability of the Delaware without the authority of Congress or the Secretary of War.  That it will deprive the State and its citizens who are riparian owners of the undiminished flow of the stream to which they are entitled by the common law as adopted by both States.  That it will injuriously affect water power and the ability to develop it.  That it will injuriously affect the sanitary conditions of the River.  That it will do the same to the industrial use of it.  That it will increase the salinity of the lower part of the River and of Delaware Bay to the injury of the oyster industry there.  That it will injure the shad fisheries.  That it will do the same to the municipal water supply of the New Jersey towns and cities on the River.  That by lowering the level of the water it will injure the cultivation of adjoining lands; and finally, that it will injuriously affect the River for recreational purposes.  The bill also complains of the change of watershed, already disposed of; denies the necessity of the diversion; charges extravagant use of present supplies, and alleges that the plan will violate the Federal Water Power Act, 16 USCA ss 791-823 (but see U. S. Code, tit. 16, s 821 (16 USCA s 821)), interfere with interstate commence, prefer the ports of New York to those of New Jersey and will take the property of New Jersey and its citizens without due process of law.

Id.

The result of the litigation was a Supreme Court decree that allowed New York to divert water, but with limitations on the quantity and certain other conditions. See id. at 481, 562-563.  Thereafter, New York commenced the construction of various dams on the River, including the Pepacton Dam.[1]  In 1954, the Supreme Court approved a modification of the earlier decree.  Thereafter, the states of New York, New Jersey, Pennsylvania, and Delaware[2] entered into a Compact, approved by the United States Congress, creating the Delaware River Basin Commissions ("DRBC").  The DRBC was created to "develop and

---

[1] The Pepacton Dam was put into service in 1955.

[2] Pennsylvania and Delaware intervened in the litigation between New York and New Jersey.

effectuate plans, policies and projects relating to the water resources of the basin." N.Y. Env. Conserv. Law § 21-0701, § 3.1.

### b.     **The Facts Behind the Current Litigation**

Defendants New York City and the Department of Environmental Protection of the City of New York (collectively "City of New York Defendants") own and operate the Pepacton Dam (the "Dam") in the Town of Colchester, County of Delaware, State of New York. Plaintiffs own property in the Town of Colchester, County of Delaware, State of New York. The Plaintiffs' property is located along, or in close proximity to, the East Branch of the Delaware River, which is downstream from the Dam.

For several days leading up to the time period of September 17-18, 2004, a tropical storm known as Hurricane Ivan (the "Storm") made landfall in the southeastern portion of the United States. The Storm traveled north through the eastern portion of the Country. The Complaint alleges that "for a period of time prior to September 17, 2004, the reservoir and waters contained by the Pepacton Dam were at a high level."

During the period of September 17-18, the Storm reached the area of Delaware County, New York dropping large amounts of rainfall in the area. The large amounts of rainfall caused "an overflow of the Pepacton Dam, in turn causing overflow of the banks of East Branch of the Delaware River, resulting in extensive flooding and damage to the real and personal property of the plaintiffs. . . ." Compl. at ¶ M.

Plaintiffs filed the instant lawsuit asserting four causes of action. The first cause of action claims that Defendants negligently failed to effectuate flood control plans. The second cause of action claims that Defendants negligently failed to cause a controlled release of the waters contained by the Dam so as to minimize the overflow. The third cause of action

claims that Defendants failed to warn Plaintiffs that the Dam was likely to overflow. The fourth cause of action asserts that Defendants failed to formulate a flood mitigation plan.

Defendants now move pursuant to Fed. R. Civ. P. 12 seeking dismissal of the Complaint in its entirety.

## III.     DISCUSSION

### a.     Standing/Res Judicata

The City of New York Defendants argue that Plaintiff do not have standing and that this matter is barred by *res judicata*. The basis for this argument is that the waters of the Delaware River, as controlled by the Dam, were the subject of litigation in the United States Supreme Court between the States of New York, Pennsylvania, New Jersey, and Delaware. See New Jersey v. New York, 347 U.S. 995 (1954); New Jersey v. New York, 51 S. Ct. 478 (1931). According to the City of New York Defendants, the State of New York acted in its capacity of *parens patriae* and represented the interests of its citizens in all matters concerning the waters of the Delaware River. Defendants further argue that matters concerning flooding could have been raised in the prior litigation.

For res judicata to apply, Defendants "must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." Monahan v. New York City Dep't of Corr., 214 F.3d 275, 284-85 (2d Cir. 2000) (citing Allen v. McCurry, 449 U.S. 90, 94, 101 S. Ct. 411, 66 L.Ed.2d 308 (1980)). The Court finds that the second and third elements are not satisfied here.

The prior litigation involved rights to the waters of the Delaware River. Upon learning that the State of New York intended to divert a large amount of water from various tributaries (including the Delaware River), the State of New Jersey sued to enjoin the diversion to protects its interests in the water. In its complaint against the State of New York, New Jersey raised several concerns that could result from New York's diversion of water, such as interfering with the navigability of the Delaware, depriving the State and its citizens of the undiminished flow of the stream, affecting water power and the ability to develop it, injuriously affecting the sanitary conditions and industrial uses of the River, increasing the salinity of the River, injuring fisheries, injuring the water supply of New Jersey cities and towns, injuring the cultivating of adjoining lands (because of lower water levels), and negatively affecting recreational uses of the River. Nothing in that litigation concerned potential damage to property owners as the result of flooding. In fact, at the time those lawsuit were initially commenced, the Dam had not even been constructed. The ultimate result of the litigation was a decree whereby the State of New York was allowed to divert water, subject to certain restrictions not relevant hereto.

Although the State of New York appears to have acted in its capacity as parens patriae in protecting the water rights of its citizens (and particularly the residents of New York City), see e.g. New York v. New Jersey, 73 S. Ct. 689 (1953), nothing in the litigation before the Supreme Court concerned protecting downstream residents from flooding. The prior litigation before the Supreme Court concerned whether there would be enough water and the consequences to river ecology, power production, and recreation. There is no indication in the cases that there was any concern or issue about flooding. The Court, therefore, rejects the argument that the State of New York was acting as *parens patriae* with respect to

protecting property owners from flood damage. The State was acting only to protect the interests of its citizens in ensuring adequate water supply. The Court, therefore, finds that the prior litigation did not involve Plaintiffs or those in privity with them and that these claims could not have been raised in the prior litigation.[3]

The cases relied upon by the City of New York do not compel a different conclusion. The case of Badgley v. City of New York, 606 F.2d 358 (2d Cir. 1979), involved plaintiffs who claimed "that the value of their land along the Delaware River . . . was diminished by the City of New York's impoundment, diversion and manipulation of the headwaters of the Delaware River for the City's public water supply purposes." Id. at 361. The plaintiff complained that the City's diversion of water interfered with their right to the "full natural flow of the Delaware River." Id. at 365. The plaintiff asserted that there were substantial fluctuations in the flow of the water as it passed their premises, and lower water temperatures resulting from the release of water from the bottom of the dam, which rendered the river unsuitable as a fishery. The plaintiff further complained that the fluctuations in volume, stage, flow and temperature had adverse effects on swimming, boating, and the general ecology of the river. The Second Circuit concluded that the State of Pennsylvania "represented all of its citizens" in the proceedings before the Supreme Court "and that the terms fo the decree are thus conclusive upon all Pennsylvania citizens and bind their rights." Id. at 364. The Second Circuit found that "the rights of Pennsylvania citizens cannot exceed those of Pennsylvania itself and the extent of Pennsylvania's rights in the Delaware River was conclusively determined by the terms of the [Supreme Court] Decree." Id. at 365.

---

[3] Indeed, it is difficult to conceive how claims arising out of the flooding of the Dam could have been asserted in the prior litigation where the final Supreme Court case on the issue (which was in 1954) predates the time that the Dam was put into service in 1955.

The critical distinction between Badgley and this case is that Badgley involved a claim resulting from a decrease in the natural flow of water and the consequences resulting therefrom. The issue of water flow and its impact on ecology, sanitation, fisheries, and recreation is precisely that which was litigated before the Supreme Court. Id. at 368. The Second Circuit thus held that, because the Supreme Court Decree set forth the States' rights to water flow and each State acted in the interests of its citizens, individual citizens could not sue for damages resulting from decreased flow. As the Second Circuit stated, the property owners "cannot recover from New York City for what their own sovereign has ceded in their behalf. . . . To grant [the property owners] damages for injuries to their riparian properties . . . would amount to a total circumvention of [the DRBC Compact] and would accomplish what would otherwise require the unanimous consent of all the parties to the Decree." Id. at 370. "What the Supreme Court decreed would be rendered nugatory by damage awards to private owners. . . ." Id. at 366.

Similarly, in State of New Jersey v. State of New York, 73 S. Ct. 689 (1953), the City of Philadelphia sought to intervene in the above-discussed litigation to protect its rights to the water. The Supreme Court concluded that the City of Philadelphia could not intervene because its interests were being protected by the State of Pennsylvania. Once again, however, the claims in the City of Philadelphia's motion to intervene involved access to the water and not the consequences of overflows or flooding.

Here, by contrast, the claims do not involve damages resulting from a decreased flow of water or from conduct expressly authorized by the Decree.[4] To the contrary, the

---

[4] Granted, the Compact permits the DRBC to engage in flood control. However, there is no indication or claim that it has done so with respect to the properties at issue here. Moreover, the Decree
(continued...)

claims involve damages resulting from flooding purportedly caused by the failure to release water from the Dam in the face of upcoming storms, the failure to warn of potential flooding, and the failure to develop a flood plan. As previously noted, there is no indication that any of the States to the Supreme Court litigation raised issues concerning flooding that may be caused by the building of reservoirs or the operation of dams. The concern in that litigation was with the consequences of decreased flow; not increased flow. Accordingly, the State of New York did not represent Plaintiffs' interests in the prior litigation and the issues in this case could not have been raised in the prior litigation. *Res judicata* is inapplicable here.

### b. Subject Matter Jurisdiction

The foregoing analysis further leads this Court to conclude that it lacks subject matter jurisdiction.[5] This action was originally commenced in state court. Defendants removed the action to this Court in reliance upon § 15.1(p) of the DRBC Compact which provides that:

> The United States district courts shall have original jurisdiction of all cases and controversies arising under the Compact, and this Act and any case or controversy so arising . . . may be removable to the appropriate United States District Court.

As previously noted, the DRBC was created to "develop and effectuate plans, policies and projects relating to the water resources of the basin." N.Y. Env. Conserv. Law § 21-0701, § 3.1. The main purpose of the Compact is to regulate the allocation of water from

---

[4](...continued)
expressly permitted the State to divert certain quantities of water. The plaintiff in Badgley sought damages from the City of New York for the consequences of diverting water that it was expressly permitted to divert. Here, by contrast, there is no indication of flood control efforts. The damages sought in this case are unrelated to the water diversion expressly authorized by the Decree.

[5] Although Plaintiffs did not challenge the removal of this action to this Court, the Court has an independent obligation to ensure it has subject matter jurisdiction.

the Delaware River among the four states that are parties to the Compact. Compact, Art. I, par. 1.3. The overriding concern of the Compact is with water resources. Id.[6] While the Compact does have a provision pertaining to flood protection, that provision merely enables, but does not require, the DRBC to engage in flood protection activities. See Compact at Article 6 ("The commission may plan, design, construct and operate and maintain projects and facilities, as it may deem necessary or desirable for flood damage reduction."). None of the events in this case are alleged to be the result of flood protection activities pursuant to the Compact.

In any event, inasmuch as Plaintiffs are not parties to the Compact, see discussion *supra* at § II(a), the instant controversy cannot be said to arise thereunder. As previously discussed, when the State of New York litigated in the Supreme Court and negotiated and entered into the Compact, it did not act on behalf of individual property owners with respect to potential property damage resulting from flooding. Thus, Plaintiffs are not subject to the Compact with respect to claims for property damage resulting from flooding and their claims for property damage do not arise out of the Compact.

Similarly, neither the Decree nor the Compact purport to address property damage resulting from the operation of reservoirs, dams, or the diversion of waters. Nothing about this litigation implicates the duties or obligations created by, or the terms of, the Compact.

---

[6] Section 1.3(e) of the Compact provides that:

In general, the purposes of this compact are to promote interstate comity; to remove causes of present and future controversy; to make secure and protect present developments within the states; to encourage and provide for the planning, conservation, utilization, development, management and control of the water resources of the basin; to provide for cooperative planning and action by the signatory parties with respect to such water resources; and to apply the principle of equal and uniform treatment to all water users who are similarly situated and to all users of related facilities, without regard to established political boundaries.

Accordingly, Plaintiffs' claims do not arise under the Compact and this Court does not have subject matter jurisdiction.

Before concluding, the Court will pause to note the likely lack of merit to Plaintiffs' claims. It is well-settled that there can be no liability for negligence absent a duty of care owed to the plaintiffs. Darby v. Compagnie National Air France, 96 N.Y.2d 343, 347 (2001). The general rule applicable to a case such as this one is that "a dam operator generally has no duty to provide flood control services for other riparian owners, or, as it is sometimes stated, that the dam operator has the right to allow water to pass through the dam in the same amount as it enters the pond behind the dam." Janet Fairchild, Liability for Overflow of Water Confined or Diverted for Public Water Power Purposes, 91 A.L.R.3d 1065 § 11(a) (and cases cited therein). "[T]he only obligation imposed upon a dam operator in the operation of the dam is not to worsen conditions downstream beyond what would have occurred in the absence of the dam." Key Sales Co. v. South Carolina Elec. & Gas Co., 290 F. Supp. 8, 23 (D. S.C. 1968); DeKalb County v. Tennessee Electric & Power Co., 17 Tenn. App. 343, 67 S.W.2d 555, 560 (1933) ("This action could only be maintained upon the theory of negligence on the part of the power company in manipulating the gates and the dam, for the company had the right to maintain the dam and to permit flood waters to pass through or over it in such quantities as flowed into it."). "The owner of a dam may permit flood waters to flow over a dam in such quantities as naturally flow into the reservoir. Such owner is under a duty not to worsen the condition of a downstream owner, but he is under no duty to improve that situation by using the dam for flood control." Kambish v. Santa Clara Valley Water Conserv. Dist., 185 Cal. App.2d 107, 110 (Cal. App. 1960). Indeed, this is the rule in New York. See Iodice v. State, 102 N.Y.S.2d 742 (4th Dep't 1951), aff'd, 303 N.Y. 740 (1951).

> In Iodice,
>
> > It [was] the contention of the claimants that the flooding of the premises was occasioned by the negligence of employees of the state of New York in the operation of the Delta Dam Reservoir in that they failed to maintain the water in the reservoir at a level sufficiently below the top elevation of the spillway to hold back additional water coming into the reservoir occasioned by excessive rain, and permitting the discharge of water into the Mohawk River in such an amount as to cause the overflow of its banks.

Id. at 743. The claimants in Iodice argued that the state was liable because "having the means to draw down the impounded water, it was the duty of the state to do so to the end that the water level should be kept below the spillway level so that 'a portion of any heavy rainfall' (Finding 46) would be retained in the reservoir and not discharged into the river in such an amount as to cause the river to overflow its bank." Id. The Appellate Division concluded that there was no such duty. Id. at 744. As that court stated:

> we know of no authority and none has been called to our attention which imposes any such duty upon the state nor has any case been cited which imposes such a duty upon a private individual or a corporation. If there was some duty, either statutory or at common law, on the part of the state to regulate the outflow of water from the dam so as to minimize or eliminate the flooding of lands below to an extent greater than would be the case if the river flowed naturally, then a negligent omission to perform the duty of such regulation would sustain an action for damages. We find no such duty. The dam was authorized and is intended as a storage reservoir for the purpose of supplying water to the Barge Canal. The funds used for its construction were authorized solely for the improvement of the canal system and not for flood control purposes. There being no statutory duty to operate the dam for flood control purposes, any duty to operate the dam for the purpose of bettering natural conditions must be found in some rule of the common law which would be applicable to a private individual or a corporation. We know of no principle of the common law which imposes any such duty.

Id. The court continued to hold that "a dam owner has the right to let nature take its course, i.e., the right to permit flood waters go over his dam where the volume of water cast into the

channel below the dam does not exceed the volume coming in above the dam." Id.  The Court reached "the conclusion that there is no responsibility or duty on the state to make flood conditions better for lower property owners than they would be if the river flowed naturally in low water and high." Id. at 747; see also Destito v. State, 1 A.D.2d 753 (4th Dep't 1955); Schloop v. State, 18 Misc.2d 485, 487 (N.Y. Court of Claims 1959).

Based upon this authority, it is clear that Plaintiffs can have no claim against the City of New York Defendants unless they can offer evidence that Defendants allowed more water to leave the dam than entered or otherwise worsened conditions downstream beyond what would have occurred in the absence of the dam.  The City purports to have evidence demonstrating that the rainstorms of September 2004 and April 2005, water entered the Pepacton reservoir in a greater volume and in a shorter time than it exited the reservoir and that the reservoir significantly attenuated the flow of water.  If true, such evidence would defeat Plaintiffs' claims.[7]

A similar result would appear to be warranted for Plaintiff's failure to warn claim. Defendants can only be said to have a duty to warn Plaintiffs with respect to conduct that might have worsened the downstream conditions.  If the only allegation or proof is that the Defendants failed to warn the downstream residents of flooding that would be no worse than under natural circumstances, then such a claim would appear to be without merit.

The claims against the County of Delaware and the Town of Colchester appear to be on even weaker ground.  Neither of those municipal entities are purported to own or

---

[7] This evidence cannot be considered by the Court because: (1) the pending motion is a motion to dismiss and the Court is precluded from considering evidence outside the pleadings; and (2) the Court does not have subject matter jurisdiction to rule on the claims.

operate the Dam. It, therefore, is difficult to conceive how they could owe any duty of care to Plaintiffs in connection with any flooding in connection with the operation of the Dam.[8]

## IV.  CONCLUSION

For the foregoing reasons, this matter is hereby REMANDED to the Supreme Court of the State of New York, Delaware County.

IT IS SO ORDERED.

Dated:   July 21, 2006

Thomas J. McAvoy
Senior, U.S. District Judge

---

[8] In light of the foregoing, Plaintiff should seriously reconsider their claims and proceed with this litigation only if there is likely to be evidentiary support for the notion that Defendants did more than simply let nature take its course. Absent any indication that water flowed out of the dam in quantities greater than it flowed in, or that Defendants otherwise created a more dangerous downstream condition than would have existed in the absence of the dam, continuing with this litigation may be a violation of Fed. R. Civ. P. 11(b) and/or 22 N.Y.C.R.R. § 130-1.1(c)(1).